[Cite as *State v. Motley*, 2023-Ohio-1811.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellee,          :

                                     Nos. 111718 and 111720

    v.                                       :

WILLIAM E. MOTLEY,                           :

    Defendant-Appellant.         :

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 1, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-669279-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John F. Hirschauer and Tasha L. Forchione, Assistant Prosecuting Attorneys, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Jonathan Sidney, Assistant Public Defender, *for appellant*.

SEAN C. GALLAGHER, J.:

{¶ 1} William E. Motley appeals his convictions for aggravated vehicular homicide and assault, having weapons while under disability, carrying concealed weapons, and operating a vehicle under the influence of alcohol, which included

attendant firearm specifications.  The trial court sentenced Motley to serve a definite 19-year aggregate term, concluding that the Reagan Tokes sentencing structure remains unconstitutional despite *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536, ¶ 17-51, 103, 123 (8th Dist.), and the lack of any new theory on the constitutional question.[1]  For the following reasons, the convictions are affirmed.

{¶ 2}   Motley drove a stolen[2] 2014 Dodge Charger while under the influence of alcohol — a blood draw revealed a blood alcohol concentration 3.5 times greater than the legal limit.  There were three other passengers.  At 60 m.p.h., on a multi-lane street with a 35 m.p.h. speed limit, Motley collided with a disabled semitruck and trailer in the curb lane.  The brunt of the impact was borne by the right-side passengers, although Motley was severely injured himself.  The front passenger, Cordon Smith, died on impact, but the right rear passenger, Michael Baird, survived.[3]  He was badly injured.  The third passenger, sitting behind Motley, Vernon DeMeo, fared better.  He immediately walked away from the scene of the collision before emergency responders could even arrive.  According to the event data recorder ("EDR") in the vehicle, which memorialized the vehicle's sensor

---

[1] The state did not appeal this determination.  It may seem tempting for the trial judge to remain steadfast upon this chosen path given the novelty of the issue, but that is not within the purview of the trial court's authority.  *Delvallie* may or may not stand the test of time, but it currently stands as the law in this district.  *See Buckeye Community Hope Found. v. Cuyahoga Falls*, 82 Ohio St.3d 539, 547, 697 N.E.2d 181 (1998) (Stratton, J., concurring) (explaining the need for her to change her vote on a case upon reconsideration).

[2] Motley was acquitted of the receiving stolen property charge.

[3] Baird died from an unrelated cause before trial.

information in the five seconds preceding the collision, Motley failed to apply the brakes until one-tenth of a second before impact.

{¶ 3} There is some confusion in the record as to which direction the steering wheel was being rotated immediately before the impact. According to the testifying officer, who downloaded the EDR data into the printed format presented to the jury, the steering wheel was rotated slightly to the right in a clockwise direction immediately before the collision. The printed EDR data indicates the opposite, that the steering wheel was rotated in a counterclockwise direction before impact. The confusion lies in the definition of the steering input, whether a positive number under the steering input column indicates a clockwise or counterclockwise rotation of the steering wheel.

{¶ 4} According to the officer who downloaded the EDR data, the steering input data is given in degrees from neutral steering. A "0" ("zero") means the vehicle is being driven perfectly straight with the steering wheel having absolutely no input. For illustrative purposes, based on that trial testimony in this case, a steering input of "90" in the EDR data means the steering wheel was turned a quarter of one full rotation, with "360" degrees indicating one full rotation. A steering input of "-90" means the steering wheel was rotated a quarter of one full rotation in the other direction. According to the trial testimony, a positive number in the "steering input" column of the EDR data indicated a clockwise rotation of the steering wheel and a negative number corresponds with a counterclockwise rotation.

{¶ 5}    The definition of "steering input," however, is available in the printed EDR data and contradicts that testimony with respect to the direction of the steering input.  According to the "general information" section of the printed EDR data, a "positive sign notation" for the "steering input" means the "steering wheel is turned counterclockwise."  In other words, a positive number in the "steering input" column denotes a counterclockwise rotation of the steering wheel as measured in degrees from zero steering input.  There is an express exception for 2005-2010 Chargers, in which case the "positive sign notation" for steering input indicates a clockwise rotation, so the direction of the steering wheel is backwards as compared to the default.  It appears this exception was the basis of the officer's testimony.

{¶ 6}    The vehicle in this case was alleged to be 2021 Dodge Charger, but the state moved to delete the year from the indictment during trial because the purported owner of the vehicle testified that it was a 2014 model year Charger.  Tr. 317:22-24.  Either way, the vehicle did not fit the exception for flipping the direction of rotation of the steering wheel as indicated by the recorded data based on the definitions provided within the printed EDR data.

{¶ 7}    Reviewing the EDR data in isolation would tend to demonstrate that the steering wheel was turned to the left (counterclockwise) for a majority of the five seconds recorded by the EDR, most of the numbers were positive, and it was turned to the right (clockwise) 1-2 degrees for only four-tenths of a second within two seconds of the impact.  Within one second of the impact, the steering wheel showed

a more significant *counterclockwise* rotation of 10-14 degrees, meaning someone was turning the steering wheel left for over a second before impact.

{¶ 8} The officer testifying as to the contents of the printed EDR data flipped the steering input directions from the printed EDR data, claiming the steering wheel was turned to clockwise 10-14 degrees immediately before the impact, giving credence to Motley's eventual theory of defense — that DeMeo grabbed the steering wheel and purposely caused the collision. This discrepancy also explains the state's demonstrative evidence, "exhibit 89," in which the Charger is depicted to be turning left at impact. For the jury, however, the discrepancy between the printed EDR data and the trial testimony was not explored or resolved, nor has it been discussed within the briefing presented in this appeal.

{¶ 9} Motley built upon the officer's testimony, claiming for the first time at trial that DeMeo, who was sitting immediately behind Motley, jumped into the front seating area and grabbed the steering wheel, yanking it to the right to purposely cause the deadly collision. Motley never provides a rationale explaining DeMeo's motive in doing so despite the inherent risk to himself — especially since DeMeo would have to be unbuckled to attempt that feat. In attempting to prove this point, Motley presented a recording of DeMeo, recorded by one of Motley's friends, apparently confirming that DeMeo grabbed the steering wheel and intended to cause the collision. According to DeMeo's out-of-court statements, he jumped into the front seat, stabbed Motley in the neck with a knife, and then grabbed the steering wheel. After the collision, at least as told by DeMeo in the recording, Smith's

decapitated head landed in DeMeo's lap, but he nonetheless survived the impact unscathed. The facts do not support most of DeMeo's out-of-court statements. Smith's head was attached to his body according to the autopsy photographs, and Motley was not stabbed in the neck according to his medical records.

{¶ 10} Motley also avoided discussing DeMeo's motive in his appellate arguments. According to DeMeo's recorded statements, Motley and the two others were settling a grudge against DeMeo and were in the process of attempting to murder him while travelling at 60 m.p.h. in the stolen vehicle Smith had provided for Motley's use. DeMeo claimed that he saw the disabled semi and purposely directed the vehicle into the rear of the trailer in an effort to save himself or die trying.[4] There is no dispute that Motley and the others had firearms in their possession, and postmortem photographs of Smith indicated he was inexplicably wearing latex gloves.

{¶ 11} After considering all the evidence presented, including DeMeo's recorded statements, the jury convicted Motley of aggravated vehicular homicide and assault, having weapons while under disability, carrying concealed weapons, and operating a vehicle under the influence of alcohol. Motley was also found guilty of attendant firearm specifications. This timely appeal followed.

---

[4] The trial court attempted to preclude Motley or his attorney from discussing DeMeo's recorded statements based on the preclusion against hearsay. After numerous violations of the trial court's evidentiary ruling, the state relented and conceded to Motley's request to admit and discuss the recording. Any error with the introduction of the recording was invited by Motley.

{¶ 12} In the first assignment of error, Motley claims his convictions for the aggravated vehicular homicide and assault crimes are against the weight of the evidence because he presented an alternate theory of causation that obviated any criminal liability for the chain of events that led to Smith's death and Baird's serious physical injuries.

{¶ 13} In evaluating a claim that the verdict is against the weight of the evidence, appellate courts must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice" so that the convictions must be reversed, and a new trial ordered. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 14} Both R.C. 2903.06 (aggravated vehicular homicide) and R.C. 2903.08 (aggravated vehicular assault) include a causation element. The state must prove that the offender caused the death of another or caused serious physical harm to another.

{¶ 15} Motley claims that his introduction of DeMeo's out-of-court statements definitively proves that Motley did not cause the collision. According to

Motley, DeMeo's conduct in grabbing the steering wheel was a superseding cause that breaks the chain of causation and alleviates Motley of any criminal responsibility. Motley provides no authority to support his claim, and as the jury was instructed, "reasonable doubt is a doubt based on reason and common sense." Tr. 734:21-22. Motley's alternate theory of causation defies common sense.

{¶ 16} According to Motley, DeMeo jumped into the front seat from the back seating area and steered the car into the disabled tractor-trailer while Motley was driving the car at nearly 60 m.p.h. Motley has failed to account for how DeMeo was able to survive that impact while unbelted and reaching around the front seat to grab the wheel during the severe and catastrophic impact, much less how DeMeo managed to walk away from the crime scene largely unscathed as compared to the rest of the occupants. Application of the weight of the evidence standard does not entail the appellate court suspending its collective common sense any more than the jury would in considering reasonable doubt. Nonetheless, and setting that aside for the sake of discussion, Motley omits crucial information from his version of DeMeo's out-of-court statements.

{¶ 17} In this appeal, Motley never explains why DeMeo claimed to have grabbed the steering wheel to cause the vehicle to impact the immovable object. According to DeMeo's recorded out-of-court statements, Motley and the other two occupants kidnapped him intending to murder DeMeo for an earlier transgression committed against someone in Motley's circle. DeMeo referred to Motley using his nickname, "Killer." Motley, Smith, and Baird, according to DeMeo, were in the

process of attempting to murder him when he grabbed the steering wheel in a last-ditch effort to either save himself or die trying. Even if DeMeo's version of events were established as fact, Motley would not be relieved of criminal responsibility for his intoxicated driving, which impaired his ability to control the vehicle at such excessive speeds, especially when coupled with his complicity in the supposed attempted murder of DeMeo that spurred DeMeo into action. And all of that fails to account for Motley's failure to use the brakes. Either way, Motley's conduct was part and parcel of the causal chain leading to the deadly collision.

{¶ 18} This is not an exceptional case warranting appellate intervention. The first assignment of error is overruled.

{¶ 19} In the second and third assignments of error, Motley claims that either his trial counsel rendered ineffective assistance of counsel for failing to object to, or the trial court committed plain error in giving of, the jury instruction for intervening causes as set forth in 2 Ohio Jury Instructions, CR Section 417.25 (Rev. May 21, 2022):

> OTHER CAUSES NOT A DEFENSE. There may be one or more causes of an event. However, if a defendant's (act) (failure to act) was one cause, then the existence of other causes is not a defense.

> INTERVENING CAUSES. The defendant is responsible for the natural consequences of the defendant's unlawful (act) (failure to act), even though (death) (physical harm to [a person] [property]) was also caused by the intervening (act) (failure to act) of another (person) (agency).

That pattern instruction was last amended in May 2022, but conforms with *State v. Price*, 162 Ohio St.3d 609, 2020-Ohio-4926, 166 N.E.3d 1155, ¶ 34, in which the

Ohio Supreme Court affirmed a jury instruction providing that "the existence of another cause is not a defense" to a criminal violation that includes a causation element for the commission of the crime. Motley has not mentioned, much less discussed, the Ohio Supreme Court's conclusion in *Price*. *See* App.R. 16(A)(7).

{¶ 20} In his reply brief, Motley argues that the pattern jury instruction is not necessarily binding authority. Although that is axiomatically a true statement of law, Motley has not demonstrated error with this particular pattern instruction. *See* App.R. 16(A)(7). 2 Ohio Jury Instructions, CR Section 417.25 is expressly based on *Price's* conclusion that "other causes," which inherently include intervening or superseding causes, or however else the "other causes" are characterized, are not a defense to criminal liability. Despite this unambiguous conclusion, Motley maintains that intervening causes "can constitute a defense to the element of causation" if the intervening or superseding cause breaks the causal chain. Motley relies on tort law to define causation in the criminal context, citing *Taylor v. Webster*, 12 Ohio St.2d 53, 56, 231 N.E.2d 870 (1967), but Motley has not presented any authority for the proposition that tort law can supplant *Price*.

{¶ 21} On this point, and as reiterated during oral argument, Motley exclusively relies on *State v. Flanek*, 8th Dist. Cuyahoga No. 63308, 1993 Ohio App. LEXIS 4282, 19 (Sept. 2, 1993). According to Motley, permitting the pattern instruction to stand in his case would create an intradistrict conflict with *Flanek*.

{¶ 22} In *Flanek*, it was concluded that "[a] defendant cannot be relieved of criminal liability merely because factors other than his acts contributed to the death,

provided such other factors are not the *sole* proximate cause of death." (Emphasis added.) *Id.*, citing *Cleveland v. Pellech*, 8 Ohio Misc.2d 37, 457 N.E.2d 961 (1983); *Toledo v. Davenport*, Lucas App. No. L-86-037 1987 Ohio App. Lexis 5699 (January 30, 1987), and *Klug v. State*, 27 Ohio Law Repr. 477 (1928). *Flanek* does not stand for the proposition that a "superseding cause" can relieve a criminal defendant of liability. It is quite the opposite. Under *Flanek*, a defendant is not criminally liable for causing an event, provided that the third party's conduct was the *sole* proximate cause of the event. In other words, the defendant's conduct did not contribute to causing the event.

{¶ 23} On the facts alone, Motley would not be entitled to that form of instruction; Motley has not demonstrated that DeMeo was the "sole" proximate cause of the collision. Even if DeMeo grabbed the steering wheel, Motley had control of the speed. Motley had control of the braking. Motley had control over his driving while exceedingly impaired. And none of that accounts for DeMeo's statements regarding Motley's attempt to murder him in that speeding vehicle, which allegedly caused DeMeo to act.

{¶ 24} But beyond that, a superseding cause is not the same as being the "sole" proximate cause of the event as discussed in *Flanek* — even if we entertained the idea of imputing the tort definition into the criminal context to supplant *Flanek* and *Price*. Here, Motley appears confused as to the difference between a "superseding cause" and the "sole proximate cause" of an event. "The Restatement refers to an intervening act of a third person which relieves one of liability for his

negligence as a 'superseding cause.'" *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 159, 451 N.E.2d 815 (1983), fn. 1, citing Restatement of the Law 2d 465, Torts, Section 440. A "superseding cause" relieves the actor of tort liability regardless of whether the actor's negligence "was a substantial factor in causing the harm." Restatement of the Law 2d 465, Torts, Section 440, Comment a.

{¶ 25} *Stanek* understood that distinction: "[a] defendant cannot be relieved of criminal liability merely because factors other than his acts contributed to the death * * * ." *Flanek,* 8th Dist. Cuyahoga No. 63308, 1993 Ohio App. LEXIS 4282, at 19. If the third party's conduct was the sole cause of the criminal act, no trier of fact can find a defendant criminally responsible for that act. *Id.* That is a rather unremarkable observation. A superseding cause instruction assumes the underlying negligence of the actor with respect to proximate causation and but for some unforeseeable conduct of a third party that contributed to the causation of the event, the actor would otherwise be liable. In other words, even if the defendant contributed to causing the event, the superseding cause, an unforeseeable event, relieves him of liability. That form of an instruction, which Motley claims is necessary, is not supported by Ohio law. Motley's attempt to inject the superseding-cause theory into criminal law would conflict with *Flanek* and *Price* on the black-letter rule that Ohio does not recognize the existence of a criminal defense based on the existence of other acts or factors contributing to the harm.

{¶ 26} Motley has not demonstrated that the form instruction is a misapplication of Ohio law, nor has he even mentioned the implications of *Price*.

According to *Price,* the existence of another cause of the event is not a defense to a crime that includes an element of causation and one can "cause" an event through contributing to the chain of events, whether that be characterized as an intervening or superseding cause. Motley has not demonstrated that 2 Ohio Jury Instructions, CR Section 417.25 is inherently flawed.

{¶ 27} Since Motley has not provided any reason to invalidate the pattern instruction or distinguish *Price,* there is no need to further discuss the jury instruction given in this case. It is not the role of an appellate court to flesh out underdeveloped arguments on behalf of one of the parties. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19, citing *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983). It suffices that Motley has not demonstrated the existence of error in the giving of the pattern jury instruction to demonstrate ineffective assistance of counsel or the existence of plain error. The second and third assignments of error are overruled.

{¶ 28} In the fourth assignment of error, Motley claims the trial court erred by denying his motion to suppress the fruits of the search warrant issued to obtain Motley's medical records, which yielded proof of his operating a vehicle while intoxicated and disproved DeMeo's hearsay claiming he stabbed Motley in the neck. The medical records demonstrated that Motley's blood alcohol concentration was 3.5 times the legal limit and that Motley had no evidence of a neck wound. Motley

appears to have waived any privacy rights to his medical records for the purposes of trial in light of his reliance on DeMeo's out-of-court statements that implicated the medical records. Neither party has addressed this concern, however, so it is simply noted.

{¶ 29} According to Motley, the warrant lacked probable cause that Motley had been operating the vehicle while intoxicated because the affidavit in support of the warrant omitted facts describing the OVI offense and instead just related the nature of the crash (hitting a stationary object at a speed in excess of the posted speed limit). There was evidence of Motley's inebriation provided by medical providers, and an open container of liquor Motley was drinking was found in the crashed vehicle, but the affiant did not rely on that evidence in the warrant application. Evidence of an OVI offense having been committed, however, is not the only method of proving an aggravated vehicular homicide or assault crime.

{¶ 30} In reviewing "the sufficiency of probable cause in an affidavit submitted for a search warrant," the trial court renders a "common-sense decision whether, given all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Marion*, 2022-Ohio-2480, 192 N.E.3d 1279, ¶ 35 (5th Dist.), citing *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1980), at paragraph one of the syllabus, and *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Appellate courts "must accord great deference to the issuing judge's

determination of probable cause." *Id.* In situations in which oral testimony is "not offered in support of a search-warrant affidavit, the [trial court] determines the sufficiency by 'evaluating only [the facts alleged within] the four corners of the affidavit and [applying] an objective reasonableness standard.'" *Id.* at ¶ 38, quoting *United States v. Richards*, 659 F.3d 527, 559 (6th Cir.2011), fn. 11 (Moore, J., concurring in judgment only), and *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir.1996). Appellate review focuses "'exclusively with the statements contained within the affidavit itself.'" *Id.* at ¶ 38, citing *Richards* and *Weaver* at 1378.

{¶ 31} Motley, addressing this concern, claims the warrant was "fatally deficient" because reckless driving alone does not justify the intrusion into a defendant's private medical records. On this point, Motley cites several out-of-state cases as persuasive authority: *Hall v. Raech*, 677 F.Supp.2d 784, 797 (E.D.Pa. 2010); *Commonwealth v. Kohl*, 532 Pa. 152, 156-157, 168-169, 615 A.2d 308 (1992); *Commonwealth v. Myers*, 640 Pa. 653, 164 A.3d 1162 (2017); *King v. Ryan*, 153 Ill.2d 449, 451-452, 463-464, 607 N.E.2d 154 (1992). All of those cases deal with some form of defining probable cause to arrest for driving while under the influence of drugs or alcohol. The warrant in this case was not based on an OVI offense under Ohio law.

{¶ 32} The affidavit for the warrant did not include any mention of probable cause to believe an OVI offense had been committed. Instead, the warrant was focused on the potential reckless or negligent driving elements of the aggravated vehicular homicide crimes based on the nature of the accident, inexplicably hitting

a stationary object at such a speed as to cause the instantaneous death of a front seat passenger. The affiant averred that probable cause existed to search Motley's medical records as evidence of the aggravated vehicular assault committed in violation of R.C. 2903.08. That crime does not necessarily depend on an OVI offense; it can be committed through reckless or negligent driving. *See, e.g., Marion*, 2022-Ohio-2480, 192 N.E.3d 1279, at ¶ 40 (5th Dist.) (concluding that the medical records are probative of a vehicular homicide based on the negligent operation of a vehicle to determine the driver's medical condition at the time of the collision).

{¶ 33} The warrant in this case was seeking the medical records to determine whether Motley was driving recklessly or negligently or had experienced some medical emergency to explain the single-car accident. The crime of aggravated vehicular homicide is not limited to an OVI offense. The fact that the warrant uncovered Motley's intoxication does not render the original affidavit invalid just because the medical records established Motley's intoxication, even if it is presumed that the intoxication was unknown to the officers at the time given Motley's medical condition at the scene of the crime. Since Motley has not addressed the reckless or negligent operation aspect of the probable cause consideration, nothing further need be said on this topic. *See* App.R. 16(A)(7). He has failed to demonstrate the existence of error, and the fourth assignment of error is overruled.

{¶ 34} In the fifth assignment of error, Motley claims the trial court erred in permitting a law enforcement officer to discuss the data recovered from the vehicle's

EDR. Importantly, Motley did not, nor has he ever, objected to the recorded data from the EDR being introduced as evidence. *See* Evid.R. 103(A). Instead, Motley's sole focus is on whether the officer who performed the perfunctory task of downloading the EDR data into a usable trial medium was properly qualified as an expert as defined under Evid.R. 702 and therefore was required to produce an expert report under Crim.R. 16(K) or violated Evid.R. 701 by proving opinion evidence despite his lack of firsthand knowledge. Motley concedes that he received a copy of the printed EDR data that was introduced at trial during the discovery process.

{¶ 35} Motley's focus on the officer's expert qualifications is misplaced. "A police officer does not need to be an expert to testify about the collection of data and recording of information at an accident scene." *State v. Mobley*, 2d Dist. Montgomery No. 26858, 2016-Ohio-4579, ¶ 31, citing *State v. Brady*, 7th Dist. Mahoning No. 13 MA 88, 2014-Ohio-5721, ¶ 43, and *Roy v. Gray*, 197 Ohio App.3d 375, 2011-Ohio-6768, 967 N.E.2d 800, ¶ 11 (1st Dist.). Motley appears to confuse a data draw with accident reconstruction, which "'involves the use of scientific methodology to draw inferences from investigative data.'" *Id.* The officer who downloaded the EDR data was not proffered or qualified as an expert to opine on the implications of the EDR data; for example, he was not testifying as an expert accident reconstructionist explaining how the accident occurred based on his review of the EDR data. He simply testified as to how the data took its printed form, and then he simply regurgitated the information in the document that was ultimately introduced into the record for the jury's consideration. Motley does not discuss nor

even identify any expert opinion rendered by the officer. This is fatal to his argument that focuses on the officer's testimony and not the reproduction of the EDR data that was introduced into evidence.

{¶ 36} If the printed version of the EDR data required an expert's interpretation; in other words, if the jury was unable to read the report and render any conclusions based solely on the report itself, then the EDR data would have been inadmissible in the form it was presented. Motley did not challenge the introduction of the printed data itself, instead focusing on the purported lack of foundation of the officer's "expert" qualifications. *See* Evid.R. 103(A)(1). This is an important distinction.

{¶ 37} The printed EDR data is simple in nature. It provides data from the vehicle's sensors for the five seconds preceding the collision (speed, whether the driver was activating the brakes, steering input in terms of degrees from driving straight, etc.). The printed EDR data is akin to downloading the contents of a cell phone and introducing that information at trial through the officer who performed the perfunctory act of downloading the extrinsic data from its original source. *See Mobley*. Motley has not identified any aspect of the printed EDR data that requires an expert's interpretation, and the officer was not qualified to testify as an expert under Evid.R. 702, which negated any requirement to produce an expert report during discovery. Further, Motley has not identified any statements from the officer that offered an interpretation of the EDR data as generally precluded under Evid.R. 701 for fact witnesses.

{¶ 38} Although the state referred to the officer as "an expert" in closing, that isolated reference would be a mischaracterization of the manner in which the evidence was introduced at trial. Motley failed to object to the state's reference in the closing argument. By failing to timely object to the state's mischaracterization of the evidence, Motley has waived all but plain error, which will not be invoked given the isolated nature of the state's commentary. The fifth assignment of error is overruled.

{¶ 39} In the sixth assignment of error, Motley claims that it was error to preclude him from introducing additional evidence of DeMeo's involvement in causing the collision. According to Motley, the court should have permitted him to impeach the state's witnesses with the contents of police reports or writings generated by other officers, which indicated that DeMeo was the passenger in the driver's side rear seat at the time of the crash or accused Baird of kidnapping, all despite the general prohibition against impeaching witnesses with extrinsic evidence. Evid.R. 616(C). Motley has not provided any discussion providing the appropriate standard of review or any authority in support of his claimed error as required under App.R. 16(A)(7). The sixth assignment of error is accordingly overruled.

{¶ 40} In the seventh assignment of error, Motley claims the trial court improperly designated discovery for counsel's review only. According to Motley, he filed a motion on January 4, 2022, seeking an in camera review of the "counsel only" designation on discovery materials. He claims the trial court denied that motion

sometime thereafter without conducting any inspection. Motley appealed his convictions in two separate appeals involving Cuyahoga C.P. CR-22-669279, a direct appeal from the sentencing entry and another appeal from the trial court's decision denying a motion for new trial. In the underlying case, there is no motion seeking any in camera review, and therefore, there can be no error.

{¶ 41} According to the state, there was an issue in another criminal proceeding, CR-21-665471, at least providing some context for Motley's assignment of error, but that case is not the subject of the current appeal. The seventh assignment of error is overruled.

{¶ 42} In the eighth assignment of error, Motley claims that he was prejudiced by the 23 postmortem photos of Smith's body introduced at trial. Motley cites *State v. Maurer*, 15 Ohio St.3d 239, 264-266, 473 N.E.2d 768 (1984), *State v. Morales*, 32 Ohio St.3d 252, 259, 513 N.E.2d 267 (1987), and *State v. Watson*, 61 Ohio St.3d 1, 572 N.E.2d 97 (1991), as controlling authority that, according to him, limits the introduction of "gruesome" photographs to less than a handful at trial.

{¶ 43} "Gruesome" photographs are admissible if that evidence is relevant and of probative value to assist the trier of fact in determining the issues, "or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Franklin*, 62 Ohio St.3d 118, 125, 580 N.E.2d 1 (1991), citing *Maurer* and Evid.R. 403. "'[T]he admission of photographs is left to the sound discretion of the trial court.'" *Id.*, citing *Maurer*.

{¶ 44} The state argues that the photographs were used by the coroner and other witnesses during trial testimony to explain the injuries and mechanism of Smith's death in reliance on *State v. Graham*, 8th Dist. Cuyahoga No. 109582, 2021-Ohio-3199, ¶ 41 (affirming the introduction of over 100 photographs of a decedent's remains).

{¶ 45} Motley claims that 23 photographs were too many, but he provides no useable framework to resolve how many photographs constitute an abuse of discretion, nor does he provide any usable definition of what constitutes a "gruesome" photograph. He merely presumes that the postmortem pictures of Smith are "gruesome." Some are more desensitized to morbid scenes than others, and Ohio law appears largely silent as to any workable definition of what constitutes a "gruesome" photograph. The photos must have shock value, *State v. Depew*, 38 Ohio St.3d 275, 281, 528 N.E.2d 542 (1988), but a picture of a corpse alone does not necessarily rise to that level. *See State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 105; *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 105.

{¶ 46} According to Motley, the state should have been limited to one or two photographs depicting the damage Motley caused to Smith, with his entire focus on the number of photographs introduced to the exclusion of demonstrating that the photographs depicted "gruesome" images. Motley's sole focus on the number of postmortem pictures is misplaced.

{¶ 47} Under *State v. Garrett*, Slip Opinion No. 2022-Ohio-4218, ¶ 114, the introduction of 17 crime scene photographs depicting close-up photographs of the victims' heads and faces was deemed not an abuse of discretion. Under *Graham*, 8th Dist. Cuyahoga No. 109582, 2021-Ohio-3199, this court affirmed the introduction of over 100 "gruesome" photographs. Under *Watson*, 61 Ohio St.3d 1, 572 N.E.2d 97, five photographs depicting the victim whose "brain was literally blown out of his skull" was too many, although the error was harmless. There is hardly any workable framework to determine what constitutes "gruesome" photographs beyond what could be best described as a "know it when we see it" practical standard of review, but beyond that, the number of postmortem photographs introduced at trial is not, in and of itself, the dispositive part of the inquiry. There is no set limit as to how many photographs are deemed unduly prejudicial.

{¶ 48} The question is the degree to which the photographs depict truly "gruesome" images, but even then, a defendant must show prejudice in order to demonstrate reversible error. *State v. Lundgren*, 73 Ohio St.3d 474, 486, 653 N.E.2d 304 (1995) (over dissent's claim that the photographs were not all "gruesome," the majority found error in the introduction of 16 autopsy photographs, but the error was harmless given the overwhelming evidence of the defendant's guilt). Prejudice is not presumed merely from the "gruesome" nature of the photographs alone. *See id.*

{¶ 49} The standard of review for the introduction of evidence is abuse of discretion. On this point, Motley has not demonstrated that the trial court abused its discretion in permitting the introduction of 23 postmortem photographs depicting the wounds and physical damage that was discussed by various witnesses at trial. The on-scene photographs introduced did not depict overly shocking images as compared to *Watson*, which vividly depicted a person shot in the head with the brain matter being exposed, but reflected the crime scene as it existed immediately after the catastrophic collision, and the autopsy photographs were discussed in establishing Smith's mechanism of death and to describe the severity of the impact. Thus, the photographs were used to assist the trier of fact in visualizing the oral testimony.

{¶ 50} And further, even if those 23 photographs were deemed "gruesome" and excessive, Motley has not demonstrated, let alone argued, the existence of prejudice from their introduction into evidence. His sole argument on this point is that the "gruesome" nature of the photographs caused prejudice. Prejudice, however, cannot be assumed solely based on the alleged "gruesome" nature of the photographs as Motley asks. *See Lundren* at 486 (concluding that the defendant was not prejudiced solely from the introduction of the photographs deemed inadmissible), citing Evid.R. 103 and Crim.R. 52(A). The eighth assignment of error is overruled.

{¶ 51} In the ninth and final assignment of error, Motley claims that cumulative errors that were individually deemed harmless combined to create

prejudice.  Under the cumulative-error doctrine, a conviction may be reversed when the cumulative effect of nonprejudicial errors "deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal."  *Garrett*, 2022-Ohio-4218 at ¶ 270, citing S*tate v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, and S*tate v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.  Having found only one error potentially deemed to be harmless error, the introduction of the autopsy and crime-scene photographs, there is no cumulative error.  The ninth and final assignment of error is overruled.

{¶ 52} The convictions are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EMANUELLA D. GROVES, J., CONCUR